## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Tony Jackson (M-07462)        )
                                        )
             Plaintiff,       )
                                         )     Case No. 19 C 50269
              v.            )
                                         )     Hon. Iain D. Johnston
Dr. Zahtz, et al.,           )
                                         )
          Defendants.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

Tony Jackson, an Illinois prisoner, filed this *pro se* civil rights action under 42 U.S.C. § 1983, claiming alleged deficiencies in the treatment of his persistent gastrointestinal conditions while incarcerated at the Dixon Correctional Center ("Dixon"). The current Defendants consist of three of his healthcare providers who contracted with or are employed by Wexford Health Sources, Inc. ("Wexford") – Dr. Merrill Zahtz, Nurse Practitioner (NP) Susan Tuell, and Nurse Sarah Woodin (collectively "the Wexford Defendants") – and the former Dixon placement officer, Jeanette Colbacchini, who is employed by the Illinois Department of Corrections ("IDOC"). Both the Wexford Defendants and Officer Colbacchini have filed motions for summary judgment, which for the reasons stated below, are both granted in full.

## BACKGROUND

Except where noted, the following facts are undisputed.[1]

### A.    The Parties

At all relevant times, Plaintiff was an IDOC inmate incarcerated at Dixon.  (Dkt. 181, Wexford Defs.' LR 56.1 Stmt., ¶ 1.)

The Wexford Defendants consist first of Defendant Dr. Zahtz, who is a licensed physician who was employed by Wexford as its Medical Director at Dixon from December 4, 2017, through March 30, 2022.  (*Id.* at ¶ 2.)  At that point, he was then transferred to a different prison.  (*Id.*)  Second, NP Susan Tuell is an Illinois-licensed nurse practitioner, who was employed by Wexford as a nurse practitioner at the Dixon from August 19, 2013, through the present. (*Id.* at ¶ 3.)  Third, Ms. Sarah Woodin is a Licensed Practical Nurse ("LPN"), employed by Wexford to work at Dixon.  (*Id.* at ¶ 4.)  The Wexford Defendants' job duties included providing medical care and treatment to the inmates at Dixon.  (*Id.* at ¶¶ 2-4.)

Defendant Colbacchini was the placement officer at Dixon during the relevant time period. (Dkt. 190, Colbacchini LR 56.1 Stmt., ¶ 2.)

---

[1] Plaintiff has filed a response to the Wexford Defendants LR 56.1 Statement of Material Facts. (Dkt. 203.) LR 56.1(e)(3).  Plaintiff has also filed a more generalized responsive pleading to Defendant Colbacchini's motion. (Dkt. 198.)  Plaintiff's factual responses frequently do not comply with the Local Rules, *see* LR. 56.1(e)(2), (3), in that they do not cite to the record when disputing Defendants' asserted facts and consist of legal argument or unsupported conclusions.  The Court will disregard these responses.  *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (court may disregard any part of factual statement or response that consists of legal arguments or conclusions).  And where Plaintiff has not properly responded to a certain fact or has admitted it, the Court will accept it as true to the extent supported by the record.  *Lamz*, 321 F.3d at 683.  Nonetheless, although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011) (unpublished), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record, or he could properly testify to them.  *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently).  The Court will not look beyond the cited material, however.  *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

**B.      Medical Distribution**

Inmates at Dixon receiving prescription medications are generally required to pick up their medications through the prison pharmaceutical services at distributions, referred to as "medicine passes", that take place at regularly scheduled intervals during the day. (Dkt. 181, ¶¶ 5-8.) Medical staff coordinate with correctional staff to authorize inmate movement so they may collect their medications. (*Id.*) An inmate who receives medications multiple times a day must collect their medications during each scheduled medicine pass. (*Id.*) Inmates may not collect multiple doses of medications during a single medicine pass. (*Id.*) An inmate who does not collect his medication during the scheduled medicine pass, without prior authorization, is considered to have refused that dosage of his medication. LPN's, including Ms. Woodin, are not authorized to distribute prescription medications to inmates outside of their scheduled dosage times without an order from a physician or nurse practitioner. (*Id.*)

**C.      Plaintiff's Medical Care and Treatment**

Plaintiff testified that he has had a non-specific bowel condition, characterized by frequent defecation, pain, and rectal bleeding, since around 2010, but which did not become "bad" until his transfer to Dixon, and which worsened thereafter. (*Id.*, ¶ 9.) Plaintiff's first complaints about his bowel condition at Dixon appear in his medical records on March 23, 2017, when Plaintiff presented at a nursing sick call with symptoms suggestive of a chronic bowel condition. (*Id.*, ¶ 10.) He complained of bleeding and frequent bowel movements (ten times per day). (*Id.*) He reported to the attending nurse that this was typical for him and that he was "[j]ust tired of the frequency that he [had] to use the bathroom." (*Id.*) The nurse documented that he had a pending appointment – date not specified – to the University of Illinois at Chicago Hospital ("UIC") at which his symptoms would be addressed further. (*Id.*) On or about March 31, 2017, Plaintiff

returned to the nurse sick call with a complaint of worsening stomach pain. (*Id.*, ¶ 11.) He also reported that he had lost weight, although the attending nurse documented that Plaintiff had rather had a slight weight increase. (*Id.*) The nurse also again documented the pending UIC appointment, but also put Plaintiff on the Nurse Practitioner line for further evaluation. (*Id.*) On July 11, 2017, Plaintiff underwent a CT scan of his pelvis. (*Id.*, ¶ 12.) The radiologist noted, among other things, that there was "no evidence for small bowel involvement to suggest Crohn's disease[]" at this time. (*Id.*) Rather, the radiologists' impression was that Plaintiff had a "[t]hickening of the rectosigmoid suggestive of ulcerative colitis." (*Id.*)

On October 10, 2017, Plaintiff underwent a colonoscopy at the UIC GI clinic (presumably the appointment referred to in the March 2017 nursing notes), at which time a biopsy was taken for further diagnostic testing. (*Id.*, ¶ 13.) The results were again indicative of ulcerative colitis. (*Id.*) But it was noted that no features of Crohn's disease were found. (*Id.*) The UIC GI clinic recommended that Plaintiff: return for a follow-up in approximately two months, that his Delzicol prescription (used to treat ulcerative colitis and Chron's disease) be increased to 400 mg, directing him to take "2 tabs PO TID indefinitely" (i.e., 2 tabs orally, three times per day, indefinitely); and for him to resume his previous diet. (*Id.*, ¶ 14.) On or about October 18, 2017, NP Kristina Mershon submitted a referral request for Plaintiff to return to UIC's GI clinic for a further follow-up. (*Id.*, ¶ 14; *id.*, Ex. C at Ex. 6.)

Plaintiff did not return to the UIC GI clinic in two months as recommended; instead, he returned five months later, on March 14, 2018. (Dkt. 203, P's Resp., ¶ 14.) On that date, March 14, 2018, Plaintiff had a follow-up with Dr. Itishree Trivedi at the UIC GI clinic. (Dkt. 181, ¶ 15.) Dr. Trivedi reviewed prior diagnostic imaging and lab reports and concluded that Plaintiff in fact did have mild Chron's colitis. (*Id.*) Dr. Trivedi also reviewed contemporary lab reports which

revealed Plaintiff had an active c-diff (clostridioides difficile) infection. (*Id.*). To treat the infection, Plaintiff was prescribed a 14-day course of vancomycin in "oral pill" form, four times a day, with instructions that Plaintiff hold off on starting Prednisone until completing the course of antibiotics. (*Id.*) To treat the Chron's disease, Dr. Trivedi further recommended that Plaintiff's Delzicol dosage be increased even further and changed to Lialda, which are both brand names for the generic drug mesalamine, and is a medication used to treat Chron's colitis. (*Id.*). Dr. Trivedi further prescribed follow-up as needed if Plaintiff's symptoms did not improve within a week. (*Id.*). Dr. Trivedi also discussed the possibility of colorectal surgery; although he did not recommend a colectomy at that time for Plaintiff's case, he did suggest a surgical consult because Plaintiff nonetheless expressed interest in the procedure. (*Id.*); (Dkt. 203, ¶ 16.)

The next day, on March 15, 2018, Dr. Zahtz therefore noted that Plaintiff would be started on vancomycin and also submitted a non-urgent referral request to send Plaintiff to the colorectal surgery clinic at UIC in one month. (Dkt. 181, ¶ 16.) On March 20, 2018, Dr. Zahtz saw Plaintiff for follow-up after the appointment at UIC. (Dkt. 181, ¶ 18.) Dr. Zahtz ordered the 14-day course of vancomycin for Plaintiff. (*Id.*, ¶ 19.) Per UIC's recommendation, Dr. Zahtz also increased the dose of Plaintiff's Delizcol, but did not change it to Lialda, and planned to start Plaintiff on prednisone (a steroid used to treat inflammatory issues) for three months after completing his course of vancomycin. (*Id.*) He also ordered moistened hygiene wipes for Plaintiff, one pack every two weeks for two months. (*Id.*, ¶ 20.)

Dr. Zahtz's order was for Plaintiff to receive his four-times daily vancomycin in liquid, rather than pill form, as had been recommended by Dr. Trivedi. (*Id.*, ¶ 19; (Dkt. 203, ¶ 18.) Dr. Zahtz testified that Vancomycin is a first-line antibiotic for treating a c-diff infection. (Dkt. 181, ¶ 17.) He explained that the medication can be provided in capsule or liquid form. (*Id.*) And he

testified that there is no difference in the efficacy of the vancomycin depending on whether it is provided in capsule or liquid form. (*Id*.) But the liquid form needs to be refrigerated. (Dkt. 203, ¶ 17.) According to Plaintiff, Dr. Trivedi had ordered the antibiotic in pill form because Plaintiff himself specifically asked for the pills. (*Id*.) Plaintiff had told Dr. Trivedi that Dixon's staff in the prison's pharmacy "has a habit" of preparing all the inmates' medications "hours early and then leav[ing] them out until every housing unit comes and gets their meds", and that is why Plaintiff requested the pill form. (*Id*.)

Plaintiff started his 14-day course of vancomycin (in liquid form) on March 21, 2018. (Dkt. 181, ¶ 21.) Dr. Zahtz noted in Plaintiff's chart on that day that IDOC's administration and Wexford's Regional Medical Director directed Plaintiff to be housed in a single cell in the prison infirmary for 24 hours in order to avoid spreading the c-diff infection while beginning his course of vancomycin, (although Dr. Zahtz had told nursing staff earlier that day that housing in the infirmary was not necessary if Plaintiff could maintain a clean toilet). (*Id.*, ¶ 21; (Dkt. 203, ¶ 21.)

Plaintiff's medication administration records show he refused some doses of his vancomycin on March 22, 24, 25, and 26, 2018. (Dkt. 181, ¶ 21.) Plaintiff says that he also refused some doses on March 28, 29, and 31, 2018 and on April 3, 2018. (Dkt. 203, ¶ 22.) Plaintiff explained that the reason for his refusals was that he believed the medication had been sitting out too long and was no longer sufficiently cold. (*Id*.)

On or about April 16, 2018, Plaintiff was seen at UIC's colorectal surgery clinic and complained of ongoing bloody diarrhea and abdominal pain. (Dkt. 181, ¶ 22.) The physician at UIC, Dr. Nordenstam, planned to present Plaintiff's case at an IBD conference. (*Id*.) He recommended a follow-up with his office once he had a chance to confer with Dr. Trivedi. (*Id*.) Dr. Nordenstam also recommended that Plaintiff be tested again for a possible c-diff infection.

6

(*Id.*)    On April 25, 2018, Dr. Zahtz saw Plaintiff for his medical writ follow-up after the appointment at UIC; Dr. Zahtz noted that he was implementing Dr. Nordenstam's plans and recommendations and that Dr. Zahtz was awaiting the results of the c-diff lab work.  (*Id.*)  Dr. Zahtz also noted that Plaintiff was told by UIC physicians that he could not be prescribed NSAIDs due to his Chron's colitis, and Dr. Zahtz made a note that Plaintiff was not to receive NSAIDs "indefinitely".  (Dkt. 181, Ex. B at Ex. 6.)

On April 26, 2018, Dr. Zahtz ordered Plaintiff to receive another 14-day course of vancomycin, again in liquid form, because his April 16th lab results were positive for c-diff.  (Dkt. 181, ¶ 23.)  Plaintiff was admitted to the prison infirmary at that time to ensure that he completed this course of antibiotics, which he did this time without missing doses.  (*Id.*)

On May 16, 2018, Dr. Zahtz ordered more moistened hygiene wipes for Plaintiff, one pack every two weeks for two months.  (*Id.*, ¶ 24.)  On July 17, 2018, an order was placed to allow Plaintiff one pack of personal wipes every two weeks, until the end of 2018.  (*Id.*, ¶ 25.)

On or about August 20, 2018, Plaintiff was scheduled to return to UIC's colorectal clinic, but the appointment did not take place; the parties dispute whether Plaintiff refused the appointment (because he objected to one of the transport drivers) or whether it was instead cancelled by either UIC or the prison.  (*Id.*, ¶ 26.)

On October 2, 2018, NP Tuell saw Plaintiff to evaluate his Delzicol prescription.  (*Id.*, ¶ 27.)  Plaintiff told NP Tuell that, depending on what he eats, he would either have solid stools or explosive diarrhea, and he listed off foods that caused problems for him.  (*Id.*)  Plaintiff also reported on-going back pain, but NP Tuell noted that he had limited options for non-steroidal anti-inflammatory (NSAID) medications due to his on-going stomach problems.  (*Id.*)  NP Tuell noted that when Plaintiff was previously prescribed Delzicol 1200mg four times per day on March 15,

2018, he was simultaneously prescribed vancomycin for an active c-diff infection. (*Id.*, ¶ 28.) NP Tuell further noted that this infection had since resolved. (*Id.*) Based on the resolution of his c-diff infection, the end of his vancomycin prescription, and in consultation with and upon the suggestion of a pharmacist at Boswell Pharmacy, the company that supplies medications to the Dixon Correctional Center, NP Tuell discussed with Plaintiff decreasing the dosage of his Delzicol prescription from 1200mg to 800mg as a maintenance dose. (*Id.*, ¶ 29.) A decrease in the dose of Plaintiff's Delzicol from 1200mg to 800mg was medically appropriate in her clinical opinion, NP Tuell testified, because the typical maximum dosage of Delzicol is 800mg and Plaintiff's symptoms were now improving. (*Id.*, ¶¶ 29, 70.) Plaintiff, however, denies that he "would have entertained" such a discussion. (Dkt. 203, ¶ 29.) NP Tuell also ordered that Plaintiff's Delzicol be provided on a "DOT" (direct observed therapy) basis to ensure that Plaintiff would take his medications. (Dkt. 181, ¶ 30.) She also noted that she had talked with a scheduler in the writ office to confirm that Plaintiff's follow-up appointment at UIC's had been rescheduled, which it had been. (*Id.*) NP Tuell finally ordered a back brace for Plaintiff's complaints of back pain, and planned a follow-up visit in two weeks to re-evaluate his condition following the decrease in the dose of his Delzicol. (*Id.*).

On October 8, 2018, Dr. Zahtz saw Plaintiff following an unrelated off-site audiology appointment. (*Id.*, ¶ 31.) Plaintiff informed Dr. Zahtz that his IBD symptoms (more frequent bowel movements) and joint pain had started to recur since the recent decrease in the dose of his Delzicol. (*Id.*) In response to Plaintiff's concerns, Dr. Zahtz returned Plaintiff to his prior dose of Delzicol the next day, October 9, 2018. (*Id.*; Dkt. 203, ¶ 231.) The pharmacist from Boswell inquired about Dr. Zahtz's order to increase Plaintiff's Delzicol, as the maximum dose is typically 800mg, but the pharmacist approved the increase upon receipt of additional information about the

UIC GI clinic's plan of care for Plaintiff. (Dkt. 181, ¶ 32.)  Dr. Zahtz also noted Plaintiff had a pending appointment at the UIC GI clinic. (*Id.*, ¶ 31.)

On October 16, 2018, NP Tuell saw Plaintiff for his scheduled two-week follow-up to discuss his Delzicol prescription. (*Id.*, ¶ 33.)  Plaintiff reported that since she changed his medications, his Chron's symptoms had worsened. (*Id.*) But NP Tuell noted that Dr. Zahtz had since returned Plaintiff's Delzicol to its original dosage of 1200mg, and she made no modifications to his prescriptions at that time.  (*Id.* ¶ 33-34.)

On or about January 10, 2019, Dr. Nancy Lank prescribed a three-month course of Boost protein drinks and theraupetic high-protein, high calorie diet for one-year for Plaintiff to help maintain and improve his weight.  (*Id.*, ¶ 35.)  She also prescribed Plaintiff a 60-day course of Naproxin, which is an NSAID.  (Dkt. 203, ¶ 35.)

On March 1, 2019, Plaintiff returned to UIC's GI clinic for a follow-up appointment.  (*Id.*, ¶ 36.)  UIC physician, Dr. Nelson, noted that Plaintiff reported that after the latest course of vancomycin was completed in May 2018, Plaintiff had gone from 15 liquid bowel movements a day to eight formed bowel movements daily, and had been "doing well" until December 2018. (*Id.*)  Since December 2018, Plaintiff had noticed more blood in his stools, an increase in the number of bowel movements during the day, and lower abdominal pain. (*Id.*)  Plaintiff reported that he had been drinking Boost protein drinks, and Dr. Nelson noted that his weight had increased from 215 to 220 pounds.  (*Id.*)  Dr. Nelson also documented that Plaintiff was obese and did not appear to have anorexia.  (*Id.*)  Dr. Nelson further noted that Plaintiff had taken Naproxin for ankle pain despite the directive not to take NSAIDs.  (*Id.*)

Dr. Nelson recommended further lab tests, including further testing for the presence of c-diff, and a colonoscopy "when next available."  (*Id.*, ¶ 37.)  Dr. Nelson recommended continuing

Plaintiff's high-dose of Delzicol at 4.8g per day because Plaintiff was still not interested in more advanced treatment of his Chron's with an immunomodulator drug, and recommended further treatment with vancomycin for c-diff if the testing was positive. (*Id*.) Additionally, Dr. Nelson also recommended that Plaintiff received flu, pneumonia, and Hepatitis B vaccines. (*Id.*)

On Mach 11, 2019, Dr. Zahtz saw Plaintiff for a follow-up from his appointment at UIC's GI clinic. (*Id*., ¶ 38.) He made notes that he was implementing Dr. Nelson's recommendations (including follow-up referrals to UIC and the immunizations), and he noted that he was awaiting the results of the c-diff lab test. (*Id.*)

The testing came back positive for c-diff, so on March 11, 2019, Plaintiff began another 14-day course of vancomycin. (*Id*., ¶ 38; Dkt. 203, ¶ 36.) This time, he received the Vancomycin in a pill form, and it was ordered "KOP," meaning "Keep on Person" so he could take the pills in his cell four times a day as prescribed. (*Id*.) According to Plaintiff, when he went to pick up the pills, LPN Woodin did give him the ordered course, but also told Plaintiff that the pills were expensive and he would not continue to receive them "constantly". (Dkt. 203, ¶ 39.) Plaintiff believes the liquid form of vancomycin "don't do anything for me". (*Id*.)

On or about March 27, 2019, Dr. Lank continued Plaintiff's hygienic wipes, one pack per week for six months. (Dkt. 181, ¶ 41.) According to Plaintiff, a worker in Central Supplies "constantly refused" to give him the wipes. (Dkt. 203, ¶ 41.)

On April 5, 2019, NP Tuell reviewed a renewal request to continue Plaintiff's Boost protein drinks. (Dkt. 181, ¶ 42.) NP Tuell noted that day that Plaintiff's weight was up to 250lbs, which is considered obese. (*Id*.) As such, NP Tuell decided to allow Plaintiff's Boost protein drinks to expire, and to follow-up with him in his chronic care clinics. (*Id*.) On April 11, 2019, Plaintiff's January 10, 2019 three-month prescription for his Boost protein drinks ended. (*Id*.)

Plaintiff states in his response that his weight was 238 lbs on this day, not 250, but he submitted no medical record documenting that weight. (Dkt. 203, ¶ 42.)

On April 17, 2019, Plaintiff saw LPN Woodin at the healthcare unit and demanded a Boost drink. (Dkt. 181, ¶ 43.) However, Plaintiff's 3-month prescription for his Boost drinks (ordered on 1/10/19) had expired. (*Id*.) LPN Woodin did not dispense Plaintiff a Boost drink that day because the prescription had expired. (*Id*.) That same day, Plaintiff saw Dr. Lank, who noted that Plaintiff's weight had decreased by 18 pounds from 250 lbs on March 23, 2019, and Dr. Lank wrote Plaintiff a new prescription for a Boost drink that day. (Dkt. 203, ¶ 43.) Plaintiff states that he showed LPN Woodin the new prescription but she refused to provide him with a Boost protein shake. (*Id*.)

On July 6, 2019, Plaintiff did not show up for his evening medications. (Dkt. 181, ¶ 44.) Plaintiff says that he is hard of hearing, and an officer did not come and get him for med-line. (Dkt. 203, ¶ 44.)

On July 11, 2019, NP Tuell saw Plaintiff following an appointment at UIC's ENT and GI clinics. (Dkt. 181, ¶ 45.) NP Tuell prescribed Plaintiff Robaxin – a muscle relaxant – for his back pain, which she noted Plaintiff was requesting. (*Id*.) Plaintiff denies that he requested Robaxin. (Dkt. 203, ¶ 44.)

On July 26, 2019, NP Tuell saw Plaintiff at a Chronic Care Clinic. She noted Plaintiff's chronic bowel condition to be good and stable. (Dkt. 181, ¶ 46.) She also noted that Plaintiff weighed 241 pounds. (*Id*.) Additionally, she noted that all recorded weight must be observed by staff because she, and other medical staff, had seen Plaintiff weighing himself prior to his appointments and then underreporting his weight to make it appear in his records that he was losing weight. (*Id*.)

On August 6, 2019, NP Susan Tuell saw Plaintiff for complaints of increased abdominal pain and continued complaints of diarrhea. (Dkt. 181, ¶ 47.) NP Tuell examined Plaintiff and noted he did not have any significant abdominal tenderness and had normal abdominal bowel sounds. (*Id*.) Plaintiff also used the restroom during the appointment, and NP Tuell noted that Plaintiff's stool was brown, soft, formed, and not diarrhea, and that he had bright red blood on his toilet tissue. (*Id*.) Bright red blood on toilet tissue suggests the presence of an external anal fissure, as compared to internal bleeding in the GI tract. (*Id*.) NP Tuell assessed Plaintiff with stomach pain and bright red blood on toilet tissue, and questioned whether Plaintiff had a self-inflicted wound. (Dkt. 181, ¶ 48.) She prescribed Plaintiff prednisone, which is a steroid used to treat inflammatory conditions such as Plaintiff's colitis. (*Id*.) She also requested copies of Plaintiff's UIC records and ordered additional lab tests. (*Id*.)

On August 14, 2019, NP Tuell saw Plaintiff for a follow-up appointment. (Dkt. 181, ¶ 49.) NP Tuell noted that she did not have any blood on her glove after performing a rectal exam of Plaintiff, and that a hemoccult test of Plaintiff's stool was negative, indicating the lack of internal bleeding in Plaintiff's GI tract. (*Id*.) NP Tuell assessed Plaintiff with rectal bleeding and prescribed him preparation H. (*Id*.) She also noted that Plaintiff would be returning to UIC shortly. (*Id*.)

Plaintiff denies self-inflicting any injury and denies under-reporting his weight. (Dkt. 203, ¶ 47.) Plaintiff says he discussed his weight loss with NP Tuell at the series of appointments in late July through August 2019, showing her in particular a medical record dated July 16, 2019, which did record his weight at 275 lbs. (*Id*.) According to Plaintiff, she became angry and expressed that the 275-pound recorded weight must have been an error because "nobody could" drop from 275 to 240 in under 20 days. (*Id*.) She did not listen to Plaintiff's complaints that "his

12

body was getting worse". (*Id.*) She also, without discussing it with Plaintiff, ordered that Plaintiff had to receive several of his medications at med-pass instead of being permitted to keep them in his cell. (*Id.*, ¶ 49.)

On September 4, 2019, Plaintiff returned to UIC's GI Clinic. (Dkt. 181, ¶ 50.) Plaintiff reported that his gastrointestinal symptoms had worsened over the past few weeks; specifically, he was having around 15 loose and bloody bowel movements a day along with abdominal pain. (*Id.*) Due to these reported symptoms, the UIC staff was concerned that Plaintiff had another c-diff infection and flare-up of irritable bowel disease. (*Id.*) The GI clinic recommended hospitalizing Plaintiff to rule out infectious causes of, and to treat, his symptoms. (*Id.*)

Therefore, immediately after his GI appointment, Plaintiff was admitted to the UIC Hospital. (Dkt. 181, ¶ 51.) Plaintiff's lab results were negative for c-diff. (*Id.*) While hospitalized, Plaintiff was given a seven-day course of IV steroids to treat his irritable bowel flare-up. (*Id.*) Plaintiff had a "partial response" to the treatment: his bowel movements decreased from 15 to 6-8 daily with continued flecks of blood, and his abdominal pain decreased. (*Id.*) Because Plaintiff's response to the IV steroids was only "partial", the UIC staff decided to escalate Plaintiff's treatment plan for his colitis/Chron's disease from 5-ASA treatment (Delzicol) to biologic therapy consisting of Inflectra infusions combined with weekly doses of oral methotrexate. (*Id.*) Plaintiff was given an Inflectra infusion on September 12, 2019 and an oral dose of methotrexate on September 15, 2019. (*Id.*)

On September 18, 2019, Dr. Zahtz saw Plaintiff for a follow-up after Plaintiff had been discharged from UIC hospital. (Dkt. 181, ¶ 52.) He noted the treatment that Plaintiff had received, including the Inflectra infusion to treat his Chron's disease. (*Id.*) Per UIC's recommendation, Dr. Zahtz planned to refer Plaintiff back to UIC's GI clinic for additional IV infusions of Remicade (a

biologic similar to Inflectra) the following week and the month thereafter. (*Id.*)

On September 19, 2019, Dr. Zahtz submitted a therapeutic diet order form for a low fiber diet for Plaintiff, per the recommendation of the physicians at UIC. (Dkt. 181, ¶ 53.)

On September 26, 2019, Dr. Zahtz saw Plaintiff for a follow-up after his Remicade IV infusions at UIC. (Dkt. 181, ¶ 54.) H e noted that Plaintiff weighed nearly 292 lbs, was gaining weight, and was feeling bloated, likely due to his current treatment regime. (*Id.*) Plaintiff also requested another prescription for Boost protein supplement drink. (*Id.*) However, given Plaintiff's unhealthy weight, a Boost drink was not necessary for Plaintiff at that time. (*Id.*) Dr. Zahtz planned to refer Plaintiff back to UIC's GI lab for further Remicade IV infusions. (*Id.*) Plaintiff denies that he reported feeling bloated. (Dkt. 203, ¶ 54.)

Despite Dr. Zahtz's order for a low fiber diet, in October 2019, Plaintiff was not receiving his therapeutic low fiber diet from the Dixon cafeteria. (Dkt. 203, ¶ 53.) Instead, he received meals with food that burned his stomach and caused rectal bleeding. (*Id.*)

On October 16, 2019, NP Tuell saw Plaintiff for several issues, including his complaint that he was not receiving his special diet at the cafeteria window. (Dkt. 181, ¶ 55.) She reviewed Plaintiff's chart and found Dr. Zahtz's order that was sent to the dietary unit regarding his special diet. (*Id.*) NP Tuell wrote Plaintiff a permit for a low fiber diet that he could carry with him to the cafeteria. (*Id.*)

On October 17, 2019, Dr. Zahtz saw Plaintiff for follow-up after he returned from UIC's GI clinic for his IV Remicade. (Dkt. 181, ¶ 56.) He renewed the order for Plaintiff's hygienic wipes, at two boxes per month through June 2020. (*Id.*) He also renewed Plaintiff's order for Boost drinks, to continue through February 2020. (Dkt. 203, ¶ 55.) He also noted "low fiber diet" under additional orders. (Dkt. 181, ¶ 56.)

Plaintiff "never received" his low fiber diet or the Boost drinks. (Dkt. 203, ¶¶ 56, 58.) The Dixon healthcare pharmacy told Plaintiff multiple times that the Boost orders were "denied". (Dkt. 203, ¶ 56.) Dr. Zahtz testified in an affidavit that at no time was he aware that Plaintiff was not receiving Boost protein shakes as ordered, being denied his special diets, or not receiving wetted toilet wipes. (Dkt. 181, ¶¶ 64-65.) If he had made such a complaint to Dr. Zahtz, he would have noted it in his records. (*Id.*) Dr. Zahtz also testified that Dixon's medical staff is not responsible for providing inmates with their prescribed special diets, which are provided by the prison's dietary unit. (*Id.*) Plaintiff states, however, that he in fact complained to Dr. Zahtz multiple times "face to face" and made him aware through grievances that he was not receiving these items. (Dkt. 203, ¶¶ 64-65.) Plaintiff says that his complaints were the reason that Dr. Zahtz "re-sent" his therapeutic diet order. (*Id.*) A notation on Dr. Zahtz's September 19, 2019 therapeutic diet order for the low fiber diet states that it was "resent to dietary" on December 12, 2019. (Dkt. 203, ¶ 55.)

On November 13, 2019, Dr. Zahtz saw Plaintiff for an appointment that was supposed to be a UIC follow-up. (Dkt. 181, ¶ 57.) Plaintiff had an appointment scheduled at the GI clinic for his Remicade IV infusion, but he had refused to go because he did not have a "flex-cuff" permit in his file to allow that would exempt him from using the standard black box restraints for writ. (*Id.*) Plaintiff stated that he wanted to go to his Remicade infusions, so Dr. Zahtz rescheduled the appointment and wrote him a flex-cuff permit. (*Id.*) At that time, Dr. Zahtz and Plaintiff also discussed that his Boost drink had been discontinued because, in part, it was soy-based, and Plaintiff claimed he had a soy allergy. (Dkt. 181, ¶ 58.) They also discussed that Plaintiff's weight—which was 295lbs at that time—had increased and the drink was no longer needed. (*Id.*)

On December 26, 2019, Dr. Zahtz saw Plaintiff for a follow-up after his recent appointment

at UIC's GI clinic for his Remicade IV infusions on December 19, 2019. (Dkt. 181, ¶ 59.) Plaintiff reported ongoing diarrhea-like stools with blood and requested a colonoscopy. (*Id*.) Plaintiff and Dr. Zahtz discussed in detail the importance of portion control when eating and to add foods like rice to his diet, to take his fish oil, folate and vitamin-D supplements, and to continue using his prescribed enemas, suppositories, and creams as needed. (*Id*.) Dr. Zahtz referred Plaintiff back to the UIC GI clinic for further Remicade infusions and planned to further evaluate his complaints of diarrhea. (*Id*.)

On January 3, 2020, NP Tuell saw Plaintiff for a follow-up. (Dkt. 181, ¶ 60.) She noted that Plaintiff was concerned about a potential flareup in his bowel symptoms. (*Id*.) He reported that his rectal bleeding had stopped but he has some 10 to 13 small liquid stools a day. (*Id*.) On exam, Plaintiff's abdomen had normal bowel sounds in all four quadrants and was non-tender on deep palpation. (Dkt. 181, ¶ 61.) (*Id*.) NP Tuell also noted that he had recently received an IV Remicade infusion at UIC. (*Id*.) She advised Plaintiff that his symptoms should improve with his recent Remicade infusion. (*Id*.) Lastly, NP Tuell instructed Plaintiff to follow-up as needed and to report any further deterioration in his condition. (*Id*.)

Plaintiff continued to return to UIC's GI clinic for follow-ups and IV Remicade infusions for his gastrointestinal issues approximately every 60 days in 2020 through March 2022. (Dkt. 181, ¶ 62.)

On dates not specified, Plaintiff says that he spoke to Dr. Zahtz "face to face" requesting to be housed in the Healthcare Unit. (Dkt. 203, ¶ 66.) He also filed numerous grievances throughout 2020 and 2021 complaining that his requests to be housed in the Healthcare Unit were being denied. (Dkt. 203, pg. 15-20.) He stated in those grievances that both Dr. Zahtz and non-party Monica Carpenter, the Head of Nursing, told him that he was too young and his conditions

16

were not sufficiently serious to qualify for housing in the healthcare unit. (*Id.*) On a form dated July 30, 2020, referring Plaintiff for continued IV Remicade infusions, a UIC physician stated, "ok to house in medical ward given complexity, defer final decision to Dr. Zahtz." (Dkt. 203, ¶ 66.) Dr. Zahtz has averred that aside from the limited circumstances where Plaintiff tested positive for c-diff and needed to be single-celled in the prison infirmary to begin his antibiotics, Plaintiff's colorectal symptoms on their own did not warrant a medical placement in the prison's health care unit. (Dkt. 181, ¶ 66.)

**D.    Additional Facts Regarding Defendant Colbacchini**

Plaintiff got into altercations with his cellmate over his constant use of the toilet in their cell. (Dkt. 190, ¶ 8.) Plaintiff often had to sleep on the toilet, and he also regularly needed to insert anal suppositories in bed. (Dkt. 198, pg. 1-2.) These actions "cause[] problems" for Plaintiff's cellmates. (*Id.*)

Plaintiff asked Colbacchini to move him to the Healthcare Unit in 2018 and 2019. (Dkt. 190, ¶ 9.) Plaintiff also asked Colbacchini to move him back to Housing Unit 35 or 42 because he "was in a comfortable situation" in those Units. (*Id.*, ¶ 10.)

Colbacchini did not have authority to place individuals in custody in the Healthcare Unit, that decision was made by facility medical staff. (*Id.*, ¶ 11.) When Colbacchini received a request to be housed in the Healthcare Unit, she would inform the individual to make the request with medical staff in the Healthcare Unit. (*Id.*, ¶ 12.)

**E.    This Lawsuit**

Plaintiff filed the operative amended complaint in this action in March 2021. (*See* Dkt. 45, Amended Compl.) In May 2021 this Court screened the amended complaint and allowed Plaintiff to proceed on claims deliberate indifference to his serious medical needs in connection with his

medical treatment at Dixon for his persistent gastrointestinal conditions. (*See* Dkt. 48.) Plaintiff had alleged a number of deficiencies with his treatment, specifically that he experienced a delays in follow-up appointments with GI specialists at UIC, received vancomycin in liquid rather than pill form, had the dosage of Delzicol improperly decreased, did not receive his therapeutic diets that he had been prescribed, did not receive moistened wipes he had been prescribed, and was refused housing in the healthcare unit. (*See id.*)

## LEGAL STANDARD

On summary judgment, the movant has the burden of showing that "no genuine dispute as to any material fact" exists and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). No "genuine" dispute exists if a court would be required to grant a Rule 50 motion at trial. *Id.* at 250–51. The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). But a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up). "Summary judgment is only warranted if, after doing so, [the Court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

## ANALYSIS

"The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (cleaned up). To prevail on a claim that his medical care violated the Eighth Amendment, the plaintiff must establish that: (1) he suffered from an objectively serious medical condition and (2) the defendants were deliberately indifferent to that condition. *See id.* at 1022 (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)).

## A.  Wexford Defendants

The parties agree that Plaintiff's gastrointestinal issues constitute a serious medical condition, and so the question is whether Plaintiff presented enough evidence to allow a reasonable jury to conclude that the Wexford Defendants were deliberately indifferent. *Lockett*, 937 F.3d at 1022.  Plaintiff did not.

Deliberate indifference consists of more than negligence or malpractice; the defendant must know of and disregard an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The requisite culpable state of mind for deliberate indifference is akin to criminal recklessness.  *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Because this is a case where the prison medical professionals made significant efforts to treat Plaintiff's bowel symptoms, the Court needs evidence that the treatment was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" in order to infer culpability. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). Put similarly, "[t]o survive summary judgment," in a case like this, an inmate "need[s] to present evidence sufficient

to show that [a medical professional's] decision was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 664 (7th Cir. 2016) (citation omitted). In assessing a claim that a prisoner was subjected to treatment by medical professionals devoid of medical judgment, the court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

The record in this case establishes that between 2018 and 2021, Plaintiff saw Dixon medical personnel (including Defendants) and outside GI specialists at UIC regularly, often multiple times monthly. When Plaintiff saw Defendants Dr. Zahtz and NP Tuell (and others), he was routinely examined and evaluated for his symptoms and underlying condition, diagnosed with the assistance of laboratory testing, prescribed steroids for bowel-symptom flare-ups, prescribed therapeutic diets and supplements, ordered and renewed palliatives on his behalf, such as moistened wipes, enema creams, and muscle relaxants, and advised regarding diet and weight. In addition, and most importantly, Dr. Zahtz repeatedly referred Plaintiff out of the prison to see the GI specialists at UIC on multiple occasions, and also approved his hospitalization to treat a flare-up on one occasion. Dr. Zahtz conducted prompt follow-up appointments after Plaintiff's appointments at UIC, and he then implemented in substantial part the specialist's treatment plan(s) for managing Plaintiff's ulcerative colitis/Chron's disease and c-diff. The GI specialists recommended that Plaintiff receive an increased dosage of Delzicol above the standard maximum dosage, and Dr. Zahtz prescribed that increased dose for years, even later over-ridding the pushback from Boswell pharmacy. The GI specialists later recommended that Plaintiff's treatment

be escalated to biologic therapy, and Dr. Zahtz therefore referred Plaintiff out to UIC for steady courses of IV Remicade infusions for years. The GI specialists recommended that Plaintiff's c-diff infections be treated with courses of the antibiotic vancomycin, and Dr. Zahtz prescribed it each time. The GI specialists recommended that Plaintiff receive a low-fiber diet, and Dr. Zahtz entered a therapeutic diet order for a low-fiber diet. And when Plaintiff complained that he was not receiving the diet from prison kitchen staff, NP Tuell wrote Plaintiff a permit for a low fiber diet that he could carry with him to the cafeteria.

Considering this totality of medical care Plaintiff received, there was no Eighth Amendment violation here. *See Riley*, 126 F.4th at 1296 (affirming summary judgment for prison medical professionals based on totality of care despite prison physicians' minor deviations from specialist's recommendations); *Kyles v. Williams*, 679 F. App'x 497, 499–500 (7th Cir. 2017) (prison medical professionals were entitled to summary judgment because a series of appointments and reasonable medical attention for prisoner's knee issues demonstrated that providers did not consciously disregard a serious risk of harm); *Wilson v. Adams,* 901 F.3d 816, 821–22 (7th Cir. 2018) (affirming grant of summary judgment on claim of deliberate indifference where "totality" of care showed proper attention to inmate's pain). Although Plaintiff experienced periodic flare-ups of his bowel symptoms, the course of treatment outlined above alleviated them for significant periods. There is nothing in the record that Plaintiff has pointed to, nor in the sequence of events described above, that suggests that the medical decisions made by the Wexford Defendants were "so far afield of accepted professional standards as to raise the inference that [they] [were] not actually based on medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Johnson*, 936 F.3d at 707; *Whiting*, 839 F.3d at 664.

The summary judgment evidence indicates only that Plaintiff was dissatisfied with his care. But inmates are not entitled to "unqualified access to healthcare," *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012), the best care possible, *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), or to receive "a specific outcome," *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1104 (N.D. Ill. 2018); *see Leiser v. Hoffman*, No. 20-2908, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("doctors are not deliberately indifferent when they are unable to eliminate completely a patient's pain") (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).  Nonetheless, the Court addresses each of Plaintiff's non-frivolous dissatisfactions below.

### 1. *Early Delay in Outside Treatment*

Plaintiff first complains that he waited five months to initially be seen at the UIC GI clinic in March 2018, whereas the UIC physicians had recommended a two-month follow-up time after his October 2017 colonoscopy.  He also complains that he did not start vancomycin until six days after he returned from the GI clinic.  Plaintiff, however, has not brought forth evidence that these delays amounted to deliberate indifference.

Delays in treatment that aggravate an injury or needlessly prolong an inmate's pain may violate the Constitution.  *See Gomez v. Randle*, 680 F.3d 859, 865–66 (7th Cir. 2012).  But "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (cleaned up); *see also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (en banc) (observing that while "inexplicable delay in treatment which serves no penological purpose" can support a claim, "delays are common in the prison setting with limited resources").

Here there is nothing in the record that suggests that any Wexford Defendant purposefully delayed the scheduling of Plaintiff's appointment (indeed a non-party entered the referral), or that

Plaintiff required a more immediate evaluation. In any event, reasonable delays caused by the need to obtain approval for a consultation with a specialist and to schedule the specialist do not violate the Constitution. *See Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) ("Anyone who has ever visited a doctor's office knows that some delays in treatment are inevitable, particularly absent a life-threatening emergency. Such delays are even more likely in the prison environment.").

Moreover, Plaintiff also was obligated to bring forth "verifying medical evidence" that the alleged delays of which he complains caused him some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm."). While expert testimony can be verifying medical evidence, medical records alone can suffice. *Id.*; *see also Walters v. Germaine*, No. 19-cv-763, 2023 WL 2374346, at *3 (S.D. Ill. Mar. 6, 2023) (verifying evidence can include expert opinions, medical records, treatment notes or physician notes). But a plaintiff's own testimony that he experienced untreated symptoms during the delay does not suffice. *Lisle v. Eovaldi*, No. 16-cv-00422, 2020 WL 1287947, at *7 (S.D. Ill. Mar. 18, 2020) (citing *Johnson v. Obaisi*, No. 16-cv-4046, 2020 WL 433872, at *7 (N.D. Ill. Jan. 28, 2020)). But that is the sole evidence of record on this issue – nothing in the medical records here demonstrates that these delays themselves caused Plaintiff distinct injury.

  *2. Vancomycin in Liquid Form*

Plaintiff next takes issue that he was originally prescribed vancomycin in liquid, rather than pill, form to treat his first c-diff infection. At Plaintiff's request, UIC-physician Dr. Trivedi recommended the pill form because Plaintiff believed that prepared doses of liquid medicines by

Dixon pharmacy staff linger outside of the refrigerator for too long. Plaintiff emphasizes that Dr. Zahtz did not follow Dr. Trivedi's recommendation, and he also asserts that the liquid form of vancomycin is not effective for him.

Contrary to Plaintiff's suggestion, Dr. Zahtz did not ignore Dr. Trivedi's recommendation: he prescribed Plaintiff vancomycin, which is undisputed as the proper treatment for a c-diff infection. Dr. Zahtz testified that he exercised his discretion to prescribe the liquid, rather than pill, form because there is no difference in the efficacy between the two. This too is undisputed – Dr. Trivedi recommended the pill form only due to Plaintiff's request, not because of a difference in efficacy or any other medical reason.

But even assuming for argument's sake that Dr. Zahtz's order for liquid vancomycin did constitute a medical disagreement with Dr. Trivedi, a departure from an outside specialist's recommendations alone rarely establishes deliberate indifference. *See Riley v. Waterman*, No. 23-1253, 2025 WL 304274, at *6 (7th Cir. Jan. 27, 2025) ("[d]isagreement ... between two medical professionals[ ] about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (internal citations and quotations omitted). Prison medical professionals may exercise professional judgment in determining a prisoner's care in light of his needs and the facility's resources, and their decisions are entitled to deference. *See Johnson,* 936 F.3d at 707; *see also Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (prison medical professionals "may choose from a range of acceptable courses" without running afoul of the Constitution); *Summers v. Standiford*, No. 19 C 2978, 2022 WL 3908673, at *5 (N.D. Ill. Aug. 30, 2022) ("jail personnel have latitude in applying outside recommendations in light of the unique challenges and policies only present in a correctional setting."). There is certainly nothing in this record to justify departure from these general rules, particularly given that the liquid

vancomycin was in fact effective. The first course in late March 2018 failed, but Plaintiff admits that he refused at least some doses (he needed four daily) on *eight out of the 14-day* course. When, in late April 2018, he in fact properly completed the course of antibiotics in liquid form, Plaintiff himself reported to the UIC GI clinic during his March 2019 visit that his c-diff had resolved and he had been doing well up until December 2018, *i.e.*, for eight months.

Plaintiff also describes an incident in March 2019 where LPN Woodin told Plaintiff that the pill form of vancomycin was expensive and Wexford would not continuously prescribe Plaintiff pills. Nonetheless, LPN Woodin *did dispense the prescribed pills at that time*, and Plaintiff's second c-diff infection resolved. This interaction therefore does not indicate that LPN Woodin disregarded a serious medical need.

### 3. Temporary Decrease in Delzicol Dosage

Plaintiff's main complaint directed at NP Tuell in particular is that she decreased his Delzicol dosage on October 2, 2018. But as documented in her medical records, it is undisputed that she conferred with the Boswell pharmacist and decreased the dosage based on a clinical judgment that Plaintiff's higher dose – which exceeded the general recommended maximum dosage – was no longer warranted given that his c-diff infection had resolved and his bowel symptoms had lessened. Plaintiff vaguely speculates throughout his response that Nurse Tuell generally based her decisions on a misguided belief that he was malingering, but that is sheer speculation. Plaintiff's personal beliefs and his bald speculation are not enough to defeat summary judgment. *See generally Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (a party "must present more than mere speculation or conjecture to defeat a summary judgment motion."); *see also Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (summary judgment is the 'put up or shut up' moment in a lawsuit."). Plaintiff has presented no

25

evidence that NP Tuell's decision to decrease the Delzicol dose was not based on the medical judgment clearly reflected in the relevant medical records and was so inadequate "that it demonstrated an absence of professional judgment." *Johnson*, 5 F.4th at 826; *see Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (a medical professional is "entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under these circumstances"). No reasonable juror could conclude that NP Tuell's exercise of medical judgment amounted to deliberate indifference.

Additionally, it is undisputed that Dr. Zahtz returned Plaintiff to the higher dose of Delzicol on October 9, 2018 – a mere seven days later. Although Plaintiff reported to Dr. Zahtz that his symptoms increased during this brief time on the lowered dose, and the Court credits this, the record also is devoid of evidence showing that the lowered dose for only a week endangered Plaintiff's health or caused other more serious health problems. The Seventh Circuit explained in *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013): "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of the failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." *Id.* (citation omitted). In *Jackson*, the Seventh Circuit rejected the contention that a three-week lapse in calcium channel blockers for an inmate diagnosed with hypertension rose to the level of a Constitutional violation, even though his blood pressure did rise during that time. *Id.* at 788-789. The Court explained, "the slight elevation above the normal range" was not enough to establish that his long-term health had been endangered. *Id.* The Court then concluded that the inmate's lawsuit was "plainly meritless."

*Id.* at 790. Plaintiff likewise has no redressable injury here based on a one-week lapse in the higher dose of his Delzicol medication.

### 4. Failure to Renew Order for Boost Protein Drinks

Next, Plaintiff complains that NP Tuell failed to renew Dr. Lank's January 2019 three-month order for Boost protein drinks in April 2019, that Dr. Zahtz failed to order him Boost protein drinks in September 2019, and that although Dr. Zahtz briefly reversed that decision in October 2019, he again discontinued the order in November 2019. Plaintiff has stated that the drinks helped him maintain and gain weight despite his frequent bowel movements, and he believes they were still necessary for that purpose on those dates.

As an initial matter, Dr. Lank's assessment in January 2019 that the Boost drinks were warranted was not binding on his later treaters, who were free to exercise their medical judgments as of the time that Plaintiff presented for care. *See Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008) ("There is not one "proper" way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field.")); *see also Scott v. Khan*, No. 20 C 4120, 2022 WL 3576682, at *5 (N.D. Ill. Aug. 19, 2022) ("a mere difference of opinion" between medical professionals does not show that one correctional doctor's care was inadequate).

And here the record establishes that such judgment was exercised by the Wexford Defendants in discontinuing the Boost drinks. As the medical records reflect, and as both NP Tuell and Dr. Zahtz testified, they declined to renew orders for Boost protein drinks because they each no longer assessed a need based on Plaintiff's increased weight. There is some dispute as to Plaintiff's precise weight at the time of his April 2019 appointment with NP Tuell – she says he weighed 250 lbs and Plaintiff says he weighed 238 lbs. NP Tuell's medical records also reflect that she believed Plaintiff at times under-reported his weight, but Plaintiff denies this. These

27

disputes are not material, however. Undisputed evidence shows that Plaintiff had in fact recently gained weight when NP Tuell discontinued the order: the UIC GI clinic reported Plaintiff's weight at 220 lbs on March 1, 2019, and thus even Plaintiff's figure of 238 lbs in April 2019 reflects a sizable weight gain at the time. And Plaintiff does not dispute that he weighed 292 lbs in September 2019 and 295 lbs in November 2019.

What is material is whether the providers exercised their medical judgment in discontinuing the Boost drinks, and clearly they did. The medical records plainly document their assessments that Plaintiff's weight range no longer necessitated Boost drinks. Plaintiff has come forward with no evidence with which to suggest his treaters' assessment in justifying the discontinuation was inappropriate and so far afield from standard practices that no reasonable provider would have done so. His own personal desire to continue the drinks and belief that they were still needed is not enough to establish deliberate indifference. *See Broadfield v. Williams*, 768 Fed. App'x 544, 549 (7th Cir. 2019) (explaining that prisoner "was not entitled to his preferred set of medications and treatments" so long as his medical providers "did not act recklessly"); *Williams v. Patton*, 761 Fed. App'x 593, 597 (7th Cir. 2019) ("mere disagreement with a medical professional's otherwise reasonable treatment is not a basis for a constitutional claim") (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)).

Plaintiff also faults LPN Woodin for refusing him a Boost drink on April 17, 2019. He says that he made her aware that Dr. Lank had renewed the previously expired order that same day. But LPN Woodin explained that she denied Plaintiff's demand for a Boost drink because the prior order had expired, and she did not have an order on file at the time. Her denial does not amount to deliberate indifference when she believed that she was following orders from Plaintiff's treaters. In any event, the record is devoid of evidence showing that one single missed dose of a

Boost drink endangered Plaintiff's health or caused other more serious health problems, so that missed dose cannot be the basis of a constitutional claim. *See Jackson*, 733 F.3d at 788-90.

    *5. Failure to Receive Prescribed Therapeutic Diets and Moistened Wipes*

Next, Plaintiff seeks to hold both Dr. Zahtz and NP Tuell liable because, at times, he was not receiving his therapeutic diets (high calorie and low fiber) from the prison cafeteria and was not receiving his moistened wipes from the supplies department. But it is undisputed that Dr. Zahtz repeatedly entered (and re-sent) therapeutic diet orders in accordance with the UIC GI specialists' recommendations. It is also undisputed that when Plaintiff complained to NP Tuell that the cafeteria was nonetheless not providing him with the diets, she wrote Plaintiff a permit for a low fiber diet that he could carry with him to the cafeteria. It is further undisputed that Dr. Zahtz repeatedly renewed the orders for moistened wipes. These actions are antithetical to deliberate indifference, and no reasonable juror could conclude otherwise.

The Court credits Plaintiff's account that the kitchen staff and supplies department were nonetheless, at times, not providing the therapeutic diets or wipes. And although it is disputed whether Dr. Zahtz was aware of this, at the summary judgment stage, the Court will credit Plaintiff (the non-movant) that he made Dr. Zahtz aware repeatedly. Nonetheless, it is undisputed that the dietary unit and supplies department, not the prison's medical staff, was responsible for ultimately supplying the diets and wipes. Plaintiff is mistaken that the Constitution demanded that the Wexford Defendants take additional action above re-sending the orders and issuing the special permit. The Seventh Circuit has "long recognized" that correctional institutions typically divide tasks "between medical professionals and other security and administrative staff." *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022). "Public officials do not have a free-floating obligation to put things to rights . . . ." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). "Bureaucracies

divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen." *Id.*

      *6. Denial of Infirmary Housing*

      Plaintiff next claims that he should have been permanently housed in Dixon's healthcare unit due to the "complexity" of his gastrointestinal issues and in particular because of his frequent toilet use. He faults Dr. Zahtz for repeatedly denying his requests.

      Here, again, there is no material dispute that Dr. Zahtz exercised medical judgment in denying Plaintiff's requests. He and the nursing staff explained, as reflected in various grievances that Plaintiff filed, that the severity level of Plaintiff's bowel symptoms, considered in conjunction with his age, did not warrant infirmary housing. Plaintiff has not come forward with any evidence to suggest this determination was so far afield from standard practice so as to indicate the absence of judgment. Indeed, Plaintiff has not produced any evidence – not even his own testimony – showing that because he was not housed in the Healthcare Unit, his gastrointestinal conditions were aggravated or otherwise caused him pain. Instead, he testified that he sought infirmary housing to have his own toilet and more privacy. *See Ballard v. Harmston*, No. 16 C 8166, 2024 WL 942424, at *6 (N.D. Ill. Mar. 5, 2024) ("There is no evidence whatsoever . . . that the move to general population caused Ballard pain or that there was any medical reason that Ballard should have stayed in the medical unit."). Again, Plaintiff's unilateral desire for specific care, in this instance permanent infirmary housing, alone does not suffice to show deliberate indifference. *See Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("[i]t is not enough that the plaintiff simply

believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment")
(internal citations omitted).

Plaintiff also points to the July 30, 2020, note from a UIC physician that stated, "ok to
house in medical ward given complexity, defer final decision to Dr. Zahtz." But this note by its
own terms deferred the decision to Dr. Zahtz, and likewise does the Constitution grant such
deference. Dr. Zahtz was allowed to substitute a determination he deemed appropriate, while
taking into consideration his understanding of prison policies, without running afoul of the Eighth
Amendment. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 764-65 (7th Cir. 2021)
(allowing medical professionals to "default to the security needs of the prison unless the medical
professional determines that an exemption is required for medical reasons"). This is so even though
the UIC physician labeled Plaintiff's condition "complex". *See id.* ("as an outside provider, [the
inmate's treater] was not in a position to assess the security concerns of the prison").

**B.    Defendant Colbacchini**

Plaintiff's response clarifies that his claim against Officer Colbacchini is in the vein of a
failure to protect claim. He argues that Colbacchini should have placed Plaintiff in the healthcare
unit or even a different living unit because he was "vulnerable" to attacks by his cellmate (and was
in fact ultimately attacked by him) due to his discomfort with Plaintiff's frequent toilet use and his
use of suppositories. But after screening under 28 U.S.C. § 1915A, the Court permitted Plaintiff
to proceed on only an Eighth Amendment claims for deliberate indifference to his medical needs.
(Dkt. 44.) A claim against Colbacchini for failure to protect against his cellmate would not be
properly joined in this action with Plaintiff's medical care claims against the Wexford Defendants.
*See Owens v. Godinez*, 860 F.3d 434, 436 (7th Cir. 2017) (citing Fed. R. Civ. P. 18, 20); *George
v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *Manson v. W. Illinois Corr. Ctr.*, No. 21-2941, 2022

31

WL 4298559, at *1 (7th Cir. Sept. 19, 2022).  Indeed, in January 2020, Plaintiff brought a separate failure-to-protect action about the attack by his cellmate precipitated by his frequent toilet use against numerous IDOC Defendants.  *See Jackson v. IDOC, et al.*, Case No. 20-cv-50021 (N.D. Ill.).  Colbacchini was dismissed from that action along with several other Defendants in September 2020 (*id.*, Dkt. 28), and judgment was entered in favor of the remaining Defendants at summary judgment in February 2024 (*id.*, Dkt. 161, 162).  Plaintiff does not get a "second bite at the apple" now: even if Plaintiff's legal theories or parties differ slightly, he may not litigate the same claims, or split his claims about this incident, in multiple independent lawsuits, instead of bringing all his claims in one proceeding.  *See, e.g., Carter v. J.P. Morgan Chase Bank*, No. 16-CV-9732, 2017 WL 1304117, at *3 (N.D. Ill. Apr. 7, 2017); *Hermann v. Cencom Cable Assoc., Inc.*, 999 F.2d 223, 226 (7th Cir. 1993); *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2013 WL 5951505, at *3 (N.D. Ill. Nov. 7, 2013).

As to the claim that was permitted to proceed in this case – namely, that Colbacchini was deliberately indifferent to Plaintiff's medical needs by not moving him from his cell to a bed in the Healthcare Unit – she is entitled to summary judgment.  The evidence is undisputed that she did not have the authority to move Plaintiff to the Health Care Unit without an order from medical staff.  The Seventh Circuit has long recognized that non-medical personnel like Colbacchini are entitled to defer to the judgment of a prison's medical staff in a matter such as this.  *See Berry v. Peterman*, 604 F.3d 435, 440–41 (7th Cir. 2010) (non-medical administrator was entitled to defer to the judgment of jail health professionals so long as he did not ignore the inmate).  As the Seventh Circuit stated in *Berry*, "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so."  *Id.* at 440; *see also Arnett*

*v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands").

\* \* \*

For all the above reasons, the Court grants summary judgment in favor of the Wexford Defendants (Dr. Zahtz, NP Tuell, and LPN Woodin) and Defendant Colbacchini, and terminates this case.[2]

## **CONCLUSION**

The Wexford Defendants' motions for summary judgment [179] [180] are granted. Defendant Colbacchini's motion for summary judgment [189] is granted. Final judgment shall enter. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Date: March 21, 2025          By: _____

Iain D. Johnston
United States District Judge

---

[2] The Court notes that there are unserved, unidentified Defendants (John/Jane Doe "Kitchen Supervisors") and one additional Defendant (Central Supplies – Ms. Phool) who remain on the docket as active Defendants. These Defendants were never served, although Plaintiff had ample instruction and opportunity to do so. Indeed, this Court specifically denied Plaintiff's request to file an amended complaint to name the John Doe "Kitchen Supervisors", finding that such amendment would be untimely. (Dkt. 170.) Consequently, dismissal is warranted as to all unidentified and unserved Defendants. *See* Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 56 (f); Fed. R. Civ. P. 15(c); *see Ellis v. Carper*, 2024 U.S. App. LEXIS 24129, \*8 (7th Cir., Sept. 23, 2024); citing *Manley v. City of Chicago*, 236 F.3d 392, 395 (7th Cir. 2001).